UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT W. RUSSELL,<br><br>*Plaintiff*,<br><br>– v. –<br><br>GREYSTONE SERVICING COMPANY LLC,<br><br>*Defendant*. | **PLAINTIFF'S ORIGINAL COMPLAINT** |

Plaintiff, Robert W. Russell ("Plaintiff" or "Russell"), files this Complaint against Defendant, Greystone Servicing Company LLC ("Defendant" or "Greystone"), in response to Greystone's material breaches of the parties' employment agreement.

## I. Nature of the Case

This case is about an employer that induced a senior executive to continue to build durable, revenue-generating assets for its benefit, expressly promised him continuing participation in the value those assets created, and then sought to keep that value for itself once the economics matured. Over more than a decade, Russell helped create three distinct sources of value for Greystone: servicing-fee economics tied to loans he and his team originated, a special servicing platform that was reported to be substantially sold on September 1, 2026, and profits from specifically identified bond investments. Greystone acknowledged that continuous role and Russell's compensation in connection with same in a written employment agreement that gave Russell defined, non-discretionary compensation rights tied to those future economic benefits.

The dispute arises because Greystone has treated those contractual rights as optional once payment became due. When servicing economics were accelerated through prepayments, Greystone attempted to avoid paying Russell's share by re-labeling and recharacterizing the value he helped create. When specific bond investments generated profits, Greystone asserted a portfolio-level theory to rationalize diluting or eliminating the profit participation the agreement tied to identified securities. And now, as Greystone has reportedly completed a sale of substantially all of the assets of the special servicing platform, Greystone is expected to claim substantial expenses and recoupment offsets to justify reductions in Russell's contractual share of the sale proceeds.

The employment agreement does not permit Greystone's actions. Russell's rights were bargained-for compensation for value already created, not gratuities dependent on Greystone's later willingness to pay. This action seeks to enforce the employment agreement according to its terms, require Greystone to account for the economic benefits it has realized and is poised to realize, and recover the compensation Russell was promised (and earned) for the assets his work helped build.

## II. Parties & Service

1. Plaintiff Robert W. Russell is an individual who resides in Palm Beach, Florida.

2. Defendant Greystone Servicing Company LLC is a Delaware limited liability company with its principal office located at 152 West 57th Street, 60th Floor, New York, New York 10019, and it may be served with process by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Greystone is a private commercial real estate finance and investment company offering debt, equity, investment

sales, and loan servicing solutions throughout the United States.

## III. Jurisdiction & Venue

3. This is a civil action over which the Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

4. Upon information and belief, complete diversity of citizenship exists between Russell and Greystone. Russell is a citizen and resident of Florida. Upon information and belief, Greystone Servicing Company LLC's ultimate owners are (a) Cushman & Wakefield, a publicly traded company originally incorporated in New York that is listed on the New York Stock Exchange ("CWK"), which has its headquarters in Chicago, Illinois, and (b) Greystone-affiliated entities ultimately owned and controlled by Stephen Rosenberg, a citizen and resident of New York.

5. The amount in controversy in this case exceeds $75,000.

6. The Court has personal jurisdiction over Greystone, and the Southern District of New York is a proper venue for this case because Greystone's headquarters are located in New York, New York.

7. This Court has jurisdiction over all claims and all parties in this action.

## IV. Factual Background

### A. Russell helped create three distinct sources of long-term value for Greystone

8. Russell worked for Greystone from approximately July 2013 through February 2026 and ultimately served as Senior Managing Director and Head of Special Servicing.

9. During that time, Russell originated commercial mortgage business, built and supervised origination and servicing teams, managed special servicing operations, sourced

investment opportunities, and materially contributed to the growth and profitability of several of Greystone's core business lines.

10. On or about October 14, 2023, the parties entered into an amended and restated employment agreement which was to be effective beginning January 1, 2023 (the "Employment Agreement").

11. The Employment Agreement was signed by Russell and by Greystone's Chief Human Resources Officer, Victoria Spevacek.

12. Ms. Spevacek was authorized to sign the Employment Agreement on behalf of Greystone.

12. The Employment Agreement specifically provided for Russell to be compensated for three separate categories of value that his efforts helped create.

13. First, the Employment Agreement granted Russell a continuing participation interest in servicing-fee revenue generated from Fannie Mae Delegated Underwriting and Servicing (DUS) loans originated by Russell and members of his team.

14. Second, the Employment Agreement granted Russell a direct participation right in the profitability and eventual sale of Greystone's special servicing platform.

15. Third, the Employment Agreement granted Russell a ten-percent participation interest in profits generated from specifically identified bond investments listed on Exhibit C, together with certain additional bond investments acquired by the special servicing team under his management during his employment.

16. These compensation provisions were negotiated because Greystone recognized that Russell's efforts created assets that would generate economic benefits for years after the underlying work was performed.

17. The Employment Agreement tied portions of Russell's compensation to future economic realizations arising from those assets.

18. The compensation rights were not discretionary or dependent upon Greystone's future goodwill. They were express contractual obligations set forth in a written agreement intended to govern Russell's continued employment.

**B. The prepayment of covered loans accelerated servicing value, yet Greystone refused to pay Russell his contractual share**

19. During Russell's employment and thereafter, dozens of loans associated with Russell's servicing portfolio prepaid before maturity. As a result of those prepayments, Greystone realized substantial economic value associated with servicing rights and future servicing income streams attributable to covered loans.

20. Consistent with industry practice and the Fannie Mae DUS servicing framework under which many of the covered loans were serviced, prepayment of a loan does not eliminate the economic value associated with servicing rights. Rather, prepayment requires the calculation and remittance of amounts attributable to the prepaid loan, including servicing-related economic interests and other amounts derived from the loan's remaining expected cash flows.

21. Prepayment represents an acceleration and realization of servicing-related value, not an extinguishment of that value.

22. As Russell explained to Greystone management, if the loans had remained outstanding, he would have continued receiving servicing-fee incentive compensation throughout the remaining loan term. When those loans were prepaid, Greystone instead received the economic value of those future servicing cash flows in connection with the prepayment event on an accelerated basis. The source of the value remained the same; only the timing of its realization changed.

23. The Employment Agreement contains no provision extinguishing Russell's servicing-fee participation rights when servicing-related value is realized through prepayment rather than through periodic servicing collections.

24. Exhibit A expressly recognizes that servicing rights may be transferred, assigned, sold, terminated, or otherwise converted into alternative forms of value while preserving Russell's right to participate in the resulting economics.

25. Nevertheless, Greystone refused to pay Russell compensation attributable to those prepaid loans and instead asserted that the proceeds should be treated as "prepayment fees" rather than servicing-related revenue.

26. Russell disputes that characterization and contends that Greystone's position is inconsistent with both the language and purpose of the Employment Agreement.

**C. Greystone has reportedly sold the special servicing platform and is expected to attempt to reduce Russell's participation**

36. Russell also played a significant role in building and growing Greystone's special servicing platform.

37. Recognizing Russell's contribution, Section 3(c)(i) of the Employment Agreement granted Russell a contractual right to receive five percent of the proceeds from

the sale of any portion of the special servicing platform, after return of Greystone's capital investment.

38. The Employment Agreement expressly provides that this right survives termination of Russell's employment unless he was terminated for Cause.

39. Russell was not terminated for Cause.

40. Russell resigned his employment in February 2026.

41. Shortly thereafter, Greystone began pursuing a transaction involving the anticipated sale of its special servicing business to C-IV Capital Partners LLC.

42. Prior to the reported close of the sale on September 1, 2026, Greystone has represented or is expected to take the position that substantial expenses should be attributed to the platform and recouped before calculating Russell's contractual share of sale proceeds.

43. Section 3(c)(i) permits Greystone to recover its capital investment before Russell's five-percent participation is calculated, but it does not permit Greystone to manufacture, inflate, or recharacterize expenses in order to defeat Russell's bargained-for participation in the economic value of the special servicing platform.

44. Greystone will be required to provide a full and transparent accounting of the gross proceeds, any claimed capital investment, and any expenses it contends must be recouped, so that Russell's contractual participation can be calculated consistently with the Employment Agreement.

**D. The Employment Agreement requires tracking and paying profits on the individual bonds identified in Exhibit C**

45. Exhibit C does not identify a pooled bond portfolio. Instead, it identifies thirty-three separate bond investments by specific Committee on Uniform Security Identification Procedures (CUSIP) number, deal designation, bond class, and ownership percentage.

46. Each identified security constitutes a separate investment capable of generating its own gains, losses, distributions, and Net Profit.

47. The agreement grants Russell the right to receive ten percent of the Net Profit associated with each of the listed bonds.

48. Had the parties intended compensation to be determined by reference to a single aggregated portfolio, there would have been no reason to identify specific securities and ownership interests on a bond-by-bond basis.

49. Nevertheless, Greystone has wrongly asserted that Russell's rights should be measured using a portfolio-level methodology that aggregates gains and losses across investments.

50. Russell disputes that interpretation and contends that the Employment Agreement requires Net Profit to be determined with respect to the individual investments identified in Exhibit C.

**E. Russell consistently asserted his rights and never waived his claims**

57. Throughout his employment, Russell repeatedly challenged Greystone's refusal to pay compensation arising from prepaid servicing assets and other contractual entitlements with senior management.

58. Russell last discussed the matter with Stephen Rosenberg, Greystone's Founder and Chief Executive Officer, only a few months before Russell resigned.

59. Mr. Rosenberg agreed that Russell not getting paid for pre-paid/accelerated servicing fees did not "seem right" to him.

60. Mr. Rosenberg also assured Russell that he would look into it.

61. Unfortunately, Mr. Russell never heard from Mr. Rosenberg again regarding the nonpayment issue.

62. Greystone never amended the Employment Agreement to disclaim the compensation at issue, never obtained a written waiver from Russell, and never provided consideration in exchange for any purported relinquishment of his clear and ambiguous contractual rights.

63. Instead, Greystone accepted and retained the benefits generated by Russell's work while refusing to pay compensation contractually owed as those benefits matured into realized economic value, and while positioning itself to limit Russell's participation in any imminent platform sale through disputed expense and recoupment assertions.

64. As a result of Greystone's conduct, Russell has suffered substantial damages and continues to be deprived of compensation expressly promised under the Employment Agreement.

## V. Claims & Causes of Action

### A. Count 1: Breach of the Employment Agreement (Failure to Pay Servicing Compensation on Prepaid Loans)

65. Plaintiff incorporates the preceding allegations by reference as if fully set forth in this section.

66. The Employment Agreement is a valid and enforceable contract between Russell and Greystone.

67. Under that agreement, Greystone promised to pay Russell annual compensation based on Net Servicing Fees generated by covered loans originated by Russell and members of his team and further agreed that Russell's servicing-compensation rights would continue through the life of the respective loans and their servicing.

68. Russell fully performed, substantially performed, or was excused from further performance of his obligations under the Employment Agreement. Among other things, Russell originated and helped build the covered loan and servicing business that generated the servicing-strip economics Greystone agreed would support his compensation.

69. Greystone breached the Employment Agreement by refusing to pay Russell the compensation owed on servicing-strip value generated by the covered loans. Greystone's breach includes, without limitation, its failure to credit Russell for servicing economics realized when loans prepaid, when future servicing-fee streams were monetized or accelerated, or when servicing-related value was otherwise received by Greystone in a form other than ordinary periodic servicing collections.

70. Greystone's contrary position—that Russell's compensation disappears whenever Greystone characterizes the realized value as something other than a servicing fee—is inconsistent with the text, structure, and commercial purpose of the Employment Agreement. The Employment Agreement ties Russell's compensation to the economic value of covered servicing rights, and it does not authorize Greystone to defeat that bargain by unilaterally re-labeling the mechanism through which that value is realized.

71. Greystone further breached the Employment Agreement by failing to provide a complete and transparent accounting sufficient to calculate Russell's servicing-strip

compensation, including the amounts collected by Greystone in connection with covered servicing rights.

72. As a direct and proximate result of Greystone's breaches, Russell has suffered damages in an amount to be proven at trial, including unpaid servicing-strip compensation, prejudgment interest, and all other relief available under the Employment Agreement and applicable law. Such damages are expected to exceed $2.5 million.

**B. Count 2: Breach of the Employment Agreement (Failure to Pay Bond Investment Profits)**

73. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

74. The Employment Agreement is a valid and enforceable contract between Russell and Greystone.

75. Section 3(c)(iii) of the Employment Agreement provides that Russell is entitled to receive "10% of the Net Profit allocated during your employment with respect to the bond investments set forth on Exhibit C attached hereto and such other bond investments sourced/acquired by the special servicing team under your management and acquired during your employment."

76. Exhibit C identifies numerous covered bond investments by specific CUSIP number, transaction designation, bond class designation, and ownership percentage.

77. Russell fully performed, substantially performed, or was excused from further performance of his obligations under the Employment Agreement.

78. During Russell's employment and thereafter, Greystone realized gains with respect to one or more of the bond investments identified in Exhibit C.

79. Greystone failed to provide a complete accounting of the performance, valuation, acquisition cost, disposition proceeds, distributions, realized gains, unrealized gains, and Net Profit attributable to those investments.

80. Greystone has further taken the position that Russell's contractual participation rights should be determined by reference to the performance of an aggregated and evolving bond portfolio pool rather than the individual bond investments specifically identified in Exhibit C. That position is contrary to the plain language of the Employment Agreement.

81. The Employment Agreement grants Russell participation rights "with respect to the bond investments set forth on Exhibit C."

82. Exhibit C identifies specific securities and specific ownership interests. It does not identify a pooled investment fund, portfolio account, trading book, or other aggregated investment vehicle.

83. By identifying separate individual securities, the parties memorialized and demonstrated their intent that Net Profit be calculated with respect to those individually identified investments.

84. Nothing in the Employment Agreement authorizes Greystone to reduce profits attributable to the specifically identified Exhibit C investments that were profitable by combining those investments with "portfolio-level" losses.

85. Greystone breached the Employment Agreement by, among other things:

a. failing to determine and allocate Net Profit attributable to the individual bond investments identified in Exhibit C;

b. failing to pay Russell ten percent of the Net Profit attributable to covered bond investments;

c. improperly applying portfolio-level accounting methodologies inconsistent with the Employment Agreement;

d. failing to provide a complete accounting sufficient to determine amounts owed to Russell; and

e. otherwise refusing to honor Russell's contractual bond participation rights.

86. As a direct and proximate result of Greystone's breaches, Russell has suffered damages in an amount to be proven at trial, expected to exceed $750,000, together with prejudgment interest, post-judgment interest, costs, and all other relief available by law.

**C. Count 3: Declaratory Judgment**

87. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

88. An actual, present, and justiciable controversy exists between Russell and Greystone concerning the proper interpretation of the Employment Agreement and the parties' respective rights and obligations thereunder.

89. The controversy is concrete and immediate because Greystone has denied liability for compensation claimed by Russell, has failed to provide complete information necessary to determine amounts owed, and has asserted contractual interpretations that would wrongfully and materially reduce or eliminate compensation otherwise payable under the Employment Agreement.

90. Among other things, Greystone has contended, or is expected to contend, that:

a. servicing-related value realized when covered loans prepay constitutes "prepayment fees" or other forms of income that fall outside the servicing compensation provisions of Exhibit A to the Employment Agreement;

b. Russell is not entitled to compensation attributable to servicing economics realized through accelerated realizations of servicing value in connection with loan prepayments;

c. Net Profit attributable to the bond investments identified in Exhibit C may be determined by reference to an aggregated and evolving portfolio rather than by reference to the individual bond investments expressly identified in Exhibit C to the Employment Agreement;

d. Russell's participation interest arising from a sale of the Special Servicing Platform may be reduced by expenses beyond the typical "capital investments" referenced in Section 3(c)(i); and

e. Greystone is not required to provide the accounting information necessary to permit Russell to determine the amounts owed under the Employment Agreement.

91. Russell disputes each of those positions and contends that Greystone's interpretations are inconsistent with the language, structure, purpose, and commercial context of the Employment Agreement.

92. An actual controversy exists regarding the proper interpretation of Exhibit A to the Employment Agreement and whether servicing-related value realized through prepayments constitute compensation-generating servicing revenue under the Employment Agreement.

93. An actual controversy further exists regarding the proper application and interpretation of Section 3(c)(iii) and whether Russell's bond-investment participation rights must be determined with respect to the individual investments specifically identified in Exhibit C, as Russell contends, or whether Greystone may instead aggregate those

investments with other portfolio assets and liabilities in a manner that dilutes or eliminates the compensation promised to Russell.

94. An additional controversy exists concerning the proper application and interpretation of Section 3(c)(i), which grants Russell a right to receive five percent of the sale of the Special Servicing Platform after "the return of Greystone's capital investments in same."

95. Russell contends that the phrase "capital investments" is limited to actual capital contributed, invested, or deployed by Greystone to acquire or develop the Special Servicing Platform and does not include ordinary operating expenses, compensation expenses, overhead allocations, corporate expenses, management fees, professional fees, litigation expenses, loss reserves, accounting write-downs, impairment charges, tax allocations, or other post hoc deductions designed to reduce Russell's contractual participation interest.

96. An actual controversy also exists regarding Greystone's obligation to provide an accounting sufficient to determine amounts owed under the Employment Agreement.

97. Russell contends that Greystone is contractually and equitably required to provide a complete accounting concerning all compensation programs governed by the Employment Agreement.

98. Such accounting must include, at a minimum:

a. all servicing-fee income, servicing-right valuations, servicing-strip calculations, servicing-transfer payments, prepayment-related recoveries, servicing settlements, and all other servicing-related revenues or proceeds attributable to covered loans;

b. all calculations, deductions, offsets, allocations, servicing-strip payments, assumptions, and adjustments used in determining compensation purportedly due under Exhibit A;

c. all acquisition costs, carrying values, fair-market valuations, realized gains, unrealized gains, distributions, recoveries, write-downs, sale proceeds, allocations, and Net Profit calculations relating to each bond investment identified in Exhibit C and any additional covered bond investments;

d. all books, records, schedules, valuations, calculations, and analyses used by Greystone in determining the performance of the bonds identified in Exhibit C;

e. all agreements, letters of intent, purchase agreements, schedules, financial statements, purchase-price allocations, board materials, valuation materials, and transaction-related documents relating to the sale or proposed sale of the Special Servicing Platform;

f. all documents and calculations reflecting Greystone's claimed capital investments in the Special Servicing Platform;

g. all deductions, allocations, expenses, offsets, reserves, write-downs, impairments, recoupments, or adjustments Greystone contends should be applied when calculating Russell's five-percent participation interest; and

h. all other books and records reasonably necessary to calculate compensation due under Exhibit A, Section 3(c)(i), and Section 3(c)(iii) of the Employment Agreement.

99. Resolution of these disputes will directly determine the amount of compensation owed to Russell and the parties' ongoing rights and obligations under the Employment Agreement.

100. A judicial declaration is necessary and appropriate because Greystone possesses and controls the relevant information, because the parties fundamentally

disagree regarding the meaning of the Employment Agreement, and because declaratory relief will remove uncertainty and settle the legal relations at issue.

101. Pursuant to 28 U.S.C. §§ 2201 and 2202, Russell seeks a declaration that:

a. servicing-related economic value realized through loan prepayments remain subject to the servicing compensation provisions of Exhibit A;

b. Greystone may not avoid its contractual obligations under Exhibit A through recharacterization of servicing-related proceeds as "prepayment fees" or similar nomenclature;

c. Section 3(c)(iii) requires Greystone to determine and allocate Net Profit with respect to the specific bond investments identified in Exhibit C rather than through portfolio-level aggregation;

d. Section 3(c)(i) permits deduction only of actual capital investments made by Greystone in the Special Servicing Platform before calculation of Russell's contractual participation interest;

e. Greystone may not reduce Russell's participation interest through deductions, expenses, reserves, charges, losses, allocations, or recoupments that do not constitute actual capital investments in the Special Servicing Platform;

f. Greystone is obligated to provide a full accounting sufficient to determine the amounts due under the servicing compensation provisions, the bond-investment participation provisions, and the Special Servicing Platform sale participation provisions of the Employment Agreement; and

g. Russell is entitled to receive all compensation owing under Exhibit A, Section 3(c)(i), and Section 3(c)(iii) of the Employment Agreement consistent with the Court's declarations.

102. Russell therefore requests entry of a declaratory judgment, supplemental equitable relief as authorized by 28 U.S.C. § 2202, an order requiring Greystone to provide the accountings described herein, and such other and further relief as the Court deems just and proper.

## VI. Conclusion & Request for Relief

Russell is not seeking a discretionary bonus or a post-employment windfall. He seeks only the compensation Greystone expressly promised to him following years of his continuing effort spent building servicing assets, investment value, and a special servicing platform that generated substantial economic benefits for the company. The Employment Agreement was designed to ensure that Russell shared in the value he helped create when that value was ultimately realized by Greystone.

Rather than honor that bargain, Greystone has attempted to avoid payment through recharacterizations, accounting methodologies, and contractual interpretations that are inconsistent with the language and purpose of the parties' agreement. Having accepted and retained the benefits of Russell's continued performance, Greystone must now be required to perform its own obligations and provide the compensation to which Russell is entitled.

Accordingly, Plaintiff Robert W. Russell asks that Defendant Greystone Servicing Company LLC be cited to appear and that, upon final hearing, the Court enter judgment in favor of Plaintiff and award the following relief:

a. Actual and compensatory damages in an amount to be determined at trial arising from Greystone's breaches of the Employment Agreement, including but not limited to unpaid servicing-fee incentive compensation, unpaid bond-investment participation compensation, and unpaid compensation arising from the sale of the Special Servicing Platform;

b. Declaration pursuant to 28 U.S.C. §§ 2201 and 2202 interpreting the Employment Agreement and declaring the parties' respective rights and obligations concerning:

    i. servicing compensation attributable to prepaid loans and other servicing-related monetization events,
    ii. calculation of Net Profit with respect to the bond investments identified in Exhibit C, and

iii. calculation of Russell's participation interest in any sale of the Special Servicing Platform;

c. An order requiring Greystone to provide a complete accounting and other information necessary to determine the compensation due to Russell under the Employment Agreement;

d. An award of all amounts due and owing under Exhibit A, Section 3(c)(i), and Section 3(c)(iii) of the Employment Agreement;

e. Prejudgment interest as permitted by applicable law;

f. Post-judgment interest at the maximum rate permitted by law;

g. Costs of court and all recoverable litigation expenses;

h. Such supplemental and equitable relief as may be necessary to effectuate the Court's declaratory judgment and enforce Plaintiff's rights under the Employment Agreement; and

i. Such other and further relief, at law or in equity, to which Plaintiff may show himself justly entitled.

Dated: September 3, 2026

Respectfully submitted,

**Stuart PC**

By: *<u>/s/ Laurence E. Stuart</u>*
Laurence E. Stuart
lstuart@stuartpc.com
629 Heights Boulevard
Houston, Texas 77007
Telephone: 713.337.3750

*Attorneys for Plaintiff,*
*Robert W. Russell*